IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
      v.                     )      Criminal Action No.
                             )      11-00118-01-CR-W-DGK
GEORGE B. HARRIS,            )
                             )
            Defendant.       )

### REPORT AND RECOMMENDATION TO DENY
### DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENT

Before the court is defendant's motion to suppress evidence seized from his vehicle on February 28, 2011, and any subsequent statement on the ground that the evidence and statements are the fruit of an illegal stop. I find that defendant was lawfully stopped by Officer Moore, he was lawfully arrested, his car was lawfully searched, and his Miranda rights were not violated. Therefore, defendant's motion to suppress should be denied.

**I. BACKGROUND**

In the middle of the night on February 28, 2011, Officer Kenneth Moore stopped defendant for speeding. Before defendant stopped his car, Officer Moore observed defendant reaching below the driver's seat and center console which caused the officer to suspect that defendant was attempting to hide or retrieve something. Once defendant was stopped and provided identification, the officer learned that defendant was driving with a revoked license and he was placed under arrest. The car

was searched before towing and a loaded 9mm semi-automatic handgun was recovered under the driver's seat. Officer Moore commented about the finding, and defendant said, "That's my wife's, it ain't mine." The gun was found to be stolen. Once defendant was advised of his Miranda rights, he admitted that he was a convicted felon, that he knew the gun was in the car, and that he had handled it on multiple occasions.

On May 23, 2011, an indictment was returned charging defendant with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Defendant filed the instant motion to suppress (document number 54) arguing that he was stopped without reasonable suspicion. The government filed a response (document number 63) arguing that (1) the officer had reasonable suspicion to stop defendant because he was speeding, (2) his car was lawfully searched pursuant to the automobile exception to the warrant requirement and because it was being inventoried prior to towing, and (3) the pre-Miranda statement falls within the public safety exception to the Miranda requirement.

I held a hearing on April 9, 2012, during which the government appeared by Assistant United States Attorneys Sara Holzschuh and Christina Tabor. The defendant was present, represented by Assistant Federal Public Defender William Raymond. The following exhibits were admitted:

2

P. Ex. 1   Google map - 71 Highway and 75th Street

P. Ex. 2   Dash camera 1 DVD

P. Ex. 3   Dash camera 2 DVD[1]

P. Ex. 5   Photograph of entrance ramp to 71 South from 75th Street

P. Ex. 6   Photograph of exit ramp from southbound 71 Highway onto 75th Street

P. Ex. 7   Photograph of speed limit signs southbound 71 Highway at 75th Street overpass

P. Ex. 8   Photograph of 75th Street entrance ramp from southbound 71 Highway

P. Ex. 9   Kansas City, Missouri, Police Department Tow Policy

P. Ex. 10  Kansas City, Missouri, Police Department Tow Report

P. Ex. 11  236 property sheet for firearm

P. Ex. 12  Photograph of firearm

The government called Officer Kenneth Moore as a witness. Defendant testified. A transcript of the suppression hearing was filed as document number 68.

## II. FINDINGS OF FACT

Based on the evidence presented at the hearing, I make the following findings of fact:

1.   At approximately 12:30 a.m. on February 28, 2011, Officer Kenneth Moore, Kansas City, Missouri, Police Department,

---

[1]These are actually on one DVD - each exhibit is a different dash cam recording but both were copied to one DVD (Tr. at 39).

was on patrol (Tr. at 5-6). He was wearing a police uniform and was driving a marked police car with overhead emergency lights (Tr. at 6). Officer Moore was traveling on the ramp from 75th Street to southbound Highway 71 at 12:32 a.m. (Tr. at 9, 41-42). Highway 71 is a four-lane highway with a center median -- two lanes are northbound and two lanes are southbound (Tr. at 8-9). There are street lights on Highway 71 at 75th Street through to 85th Street, which is approximately one mile (Tr. at 9, 56). A vehicle traveling the ramp from 75th Street onto southbound Highway 71 would be going up a hill as the highway sits higher than 75th Street (P. Ex. 5).

2.    Officer Moore looked in his rear view mirror as he was traveling on the ramp to southbound Highway 71 to make sure he could safely merge (Tr. at 9-10). He saw headlights in the far left lane (the passing lane) approaching at what appeared to be a high rate of speed (Tr. at 10, 14, 60). The headlights "were coming way too fast." (Tr. at 11). There were no other cars around at the time (Tr. at 13).

3.    Officer Moore is radar certified (Tr. at 12). In the training to become radar certified, he was taught to first observe a vehicle and notice that it is traveling at a high rate of speed prior to putting a laser or radar on the vehicle (Tr. at 12). In his experience using a radar, he has observed vehicles and used radar well over 200 or 300 times (Tr. at 12). Officer

4

Moore's guesses as to the speed of a vehicle are normally within 5 miles per hour of the speed confirmed by radar (Tr. at 13).

4.   When Officer Moore was on the ramp, he was going 41 miles per hour (Tr. at 14).  By the time he merged onto the highway, he was traveling 55 miles per hour, which is the speed limit on Highway 71 (Tr. at 14, 15, 60-61).  The speed limit is marked by signs both before and after the 75th Street entrance ramp (Tr. at 16-18).  Officer Moore sped up so that he was going to same speed as the vehicle -- a gray Chrysler 300; he looked at his speedometer and saw that he and the other car were going 75 miles per hour (Tr. at 14, 44, 60).  He decided to stop the driver (Tr. at 44).  When Officer Moore was going 75 miles per hour, the other car passed him (Tr. at 14).  Officer Moore was surprised the car passed him since he was in a marked police car; in his experience it is not normal for a driver to do that (Tr. at 43).  At that time, he pulled behind the suspect car and turned on his emergency lights, spot light, and siren (Tr. at 14-15, 18, 19).

5.   After Officer Moore turned on his lights and siren behind the speeding car, he observed the driver leaning forward and going from side to side in the vehicle (Tr. at 18, 44).  The spot light on the police car illuminates the inside of the subject's car so the officer can better see what is going on inside the car (Tr. at 19-20, 44).  The driver did not begin to

5

slow down immediately; but after an unusual length of time, he hit his brakes (Tr. at 19). Defendant pulled over before he reached 85th Street (Tr. at 57).

6. The length of Highway 71 on which defendant was traveling while being pursued by Officer Moore was bordered by shoulders on both the right and the left (Tr. at 21). Typically a car being pulled over will pull over to the shoulder on the right side of the road[2] (Tr. at 21).

7. Because defendant was making movements in his car before pulling over, Officer Moore became concerned - it was his experience that a person making such movements is either trying to hide something or trying to retrieve some sort of weapon (Tr. at 22). As he pursued the car, Officer Moore notified dispatch of his location and the vehicle description (Tr. at 22). He also requested back up (Tr. at 22).

---

[2]I will take judicial notice of the fact that the normal action would be to pull to the right, given R.S. Mo. § 304.022 which provides in pertinent part: "Upon the immediate approach of an emergency vehicle giving audible signal by siren or while having at least one lighted lamp exhibiting red light visible under normal atmospheric conditions from a distance of five hundred feet to the front of such vehicle or a flashing blue light authorized by section 307.175, the driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as far as possible to the right of, the traveled portion of the highway and thereupon stop and remain in such position until such emergency vehicle has passed, except when otherwise directed by a police or traffic officer."

6

8.    Once defendant pulled over on the left shoulder of the highway, Officer Moore exited his patrol car, stood behind his door, and ordered defendant to put his hands outside the windows so both hands could be seen (Tr. at 22).  Officer Moore had his gun drawn (Tr. at 22-23).  Defendant put his left hand out the window, and Officer Moore had to continue giving him commands to put both hands out of the window (Tr. at 23).  Defendant was hesitant to put his right hand out of the window (Tr. at 23).

9.    Defendant put his right hand out of the window and at that point became compliant (Tr. at 23).  Officer Moore approached defendant's vehicle with his gun pointed toward the ground (Tr. at 23).  He looked inside the vehicle to see if anything was on defendant's lap or near his lap that might resemble a weapon (Tr. at 23).  He did not see anything, so he holstered his weapon (Tr. at 23-24).  The following colloquy occurred:

Defendant:  I wasn't trying to do nothing (inaudible).

Officer Moore:  Okay man but you're fidget -- you're fiddling around in here.

Defendant:  Oh no.

Officer Moore:  I don't know what you're doing and you're taking all kinds of time to pull over.

Defendant:  Well I thought I had to put...

7

Officer Moore:  Keep your hands[3] out here.

Defendant:  Well I thought oh thought I had put my signal on there.[4]  I'm sorry about that cause I did I looked down at the signal I thought...

Officer Moore:  Okay we'll you're jacking all around dude.  I can see you back here in the car.

Defendant:  Oh nah.

Officer Moore:  I don't know what you're doing whether you're ducking down to get a gun or put a gun away or what?

Defendant:  Oh fuck nah hell nah I just got through picking up my daughter man from taking her down to fucking IRS.  That's ... that's all.  I was down on Pershing that's all.

Officer Moore:  Alright let me see your driver's license dude.  Where's it at?

Defendant:  Right here, right here, right here (inaudible).  Insurance is in the dash.

Officer Moore:  Okay.

Defendant:  I cut everything off.

Officer Moore:  You know you're going ... you know you're going pretty fast didn't you?

Defendant:  Well man shit I'm trying to get back home. Hell I ... and oh Lord shit.

Officer Moore:  That's the reason I pulled you over man I ... you was going way fast.

_____

[3]The transcript includes "inaudible" in place of "Keep your hands", which can be heard on the DVD.

[4]The transcript omitted the words "had" and "there" in this sentence, but those words can be heard on the DVD.

8

Defendant:  Well I know, I just come up the fucking highway and, and I don't have[5] my license ... my wife just went and paid the shit today man.

Officer Moore:  Okay.

Defendant:  I gotta go back to court so um ...

Officer Moore:  Alright where's the insurance sir?

Defendant:  You need insurance?

Officer Moore:  Yes, sir.

Defendant.  Let me get this here out.  Yeah I'm just ... shit ... Got off work and[6] (inaudible).

Officer Moore:  Alright sit tight man.

(P. Ex. 2-3, 4; Tr. at 45-46).

10.  Officer Moore did not understand what defendant was trying to tell him because everything was broken up and he was not making a lot of sense (Tr. at 24, 46).  Defendant said he was coming from the IRS, which did not seem plausible in the middle of the night (Tr. at 24).  Officer Moore also noticed an odor of marijuana coming from the car (Tr. at 27).  A back-up unit arrived, and defendant handed Officer Moore a Missouri identification but not a driver's license (Tr. at 24).  The top of the i.d. card said, "Non-Driver's License" (Tr. at 25).

---

[5]The transcript shows the word "and" but on the DVD it appears to me that defendant said "I don't <u>have</u> my license" rather than "I don't <u>and</u> my license."

[6]The transcript omitted the words "Got off work and" but this can be heard on the DVD.

9

11.  Officer Moore explained to Officer Dummit why a back-up was called -- Officer Moore does not normally call for back up unless something happens that causes a heightened alert (Tr. at 46).  He told Officer Dummit that defendant was "barreling" down Highway 71 at a high rate of speed and was making movements in the car that were not normal and he appeared to be trying to hide a weapon or some form of contraband (Tr. at 46, 49).

12.  The back-up officers watched defendant while Officer Moore went to his car and ran a computer check (Tr. at 24, 49).  The back-up officers did not have their guns drawn (Tr. at 25, 46).

13.  Officer Moore learned through the computer check that defendant's driver's license had been revoked (Tr. at 25, 50).  He also learned that defendant had previously been known to assault a law enforcement officer and to commit larceny (Tr. at 26, 50).  Officer Moore notified the other officers that defendant was driving while revoked (Tr. at 50).  He asked defendant to exit his vehicle (Tr. at 26).  He told defendant that he was being arrested for driving while revoked, and Officer Moore also mentioned that he could smell marijuana (Tr. at 50).  Defendant seemed not to understand what Officer Moore was talking about (Tr. at 50).

14.  Defendant had something in his hand as he got out of his car (Tr. at 27).  Officer Moore told defendant to leave

10

everything on the seat of the car, but he did not listen (Tr. at 27). Defendant wanted to talk and turn around; he was telling Officer Moore that his prior assault conviction was 25 years ago but Officer Moore did not know when it had occurred (Tr. at 27, 50). Officer Moore had to tell defendant to put his hands behind his back (Tr. at 27). Defendant continued to fiddle with his right hand which was holding a wallet (Tr. at 27). Officer Moore took the wallet and placed it on top of the car and then put defendant in handcuffs (Tr. at 27).

15. Officer Moore asked defendant if there was anything in the car that the officers needed to know about (Tr. at 28). He asked this question for his own safety and that of the other officers -- he could easily put his hand where a gun is hiding during a search and it could go off; needles or razor blades used in the drug business could stick or cut a searching officer (Tr. at 33). Defendant alluded to the fact that there was a joint somewhere, although he did not actually say where it was (Tr. at 28, 51). Defendant tried to tell Officer Moore that the car belonged to defendant's wife (Tr. at 51).

16. Officer Moore collected defendant's wallet after he had been placed under arrest (Tr. at 27-28). Inside the wallet was a clear plastic baggie of marijuana that defendant had been trying to stuff into his wallet when he was getting out of the car (Tr. at 28).

11

17.   Officer Moore conducted an inventory search of the car
since defendant was under arrest and the car was going to be
towed (Tr. at 28).  Police department policy provides that a car
on the left-hand side of the roadway and too close to the lane of
traffic cannot be left there (Tr. at 29).  Such a car much be
towed because it would have caused a road hazard to rush-hour
traffic later that morning (Tr. at 29).  When a car is towed, an
inventory search must be conducted in order to protect the
department and to protect the person's property (Tr. at 29).

18.   Officer Moore looked under the driver's seat and saw
the barrel of a handgun (Tr. at 28).  He made the gun safe by
taking the magazine out -- the magazine was loaded with six
rounds (Tr. at 33).  Officer Moore was upset because he had asked
defendant if there was anything in the car he needed to know
about, and he believed this was a safety issue (Tr. at 33).  He
testified that it was a "little unnerving" when he found "the
barrel of a gun sticking in my face when I go underneath a seat"
(Tr. at 52).  He said to defendant, "You know I asked you if
there was anything in the goddamn car.  There's a freaking gun."
(Tr. at 52).  Defendant said, "Well it's probably my wife's."
(Tr. at 35, 52).

19.   Officer Moore made the statement to defendant about the
gun because he was upset (Tr. at 34, 35, 52).  He did not make
the comment to defendant regarding the firearm for the purpose of

12

seeking out testimony (Tr. at 34). Because of the firearm, Officer Moore feared that some other item could be in the vehicle that could cause him or the other officers harm (Tr. at 34).

20. Officer Moore went back to his patrol car and called in the serial number from the handgun (Tr. at 35). He learned through a computer check that the gun had been stolen from Leavenworth, Kansas, in 2003 (Tr. at 35). Officer Moore also learned that defendant had a felony conviction, so in addition to being under arrest for driving without a license, he was arrested for being a felon in possession of a firearm (Tr. at 35).

21. Defendant testified as follows:

On the day before he was arrested, defendant worked as a manager of a Bi-Rite in Grandview (Tr. at 87). After work, someone called him and asked for a jump at the IRS building, so he drove from Grandview to downtown "to help a friend out" (Tr. at 87, 93). When he got to the IRS building, he was escorted to the back by the security -- these are officers who secure the parking lots and the perimeters of the IRS campus (Tr. at 88). Once the car was jumped, defendant followed the friend home to the area of 27th and Troost, and then told her to start up her car again (Tr. at 88, 94). It started, but he told her to get a new battery the next day (Tr. at 88).

Defendant got on Highway 71 from 27th Street to head home (Tr. at 88, 89). When he got to the area of 75th Street, a cop threw his spotlight on defendant (Tr. at 89). Defendant looked at his speed -- he was going 55 -- and because he was not speeding, he "just continued to go on to do what I was doing." (Tr. at 89, 91). "It was really bright and I look over at him

13

like, you know, I didn't know what was the reason. And so I ignored it." (Tr. at 91).

When defendant was asked whether he braked, he said, "I don't know which one -- what point this is. It's when he just -- after he had just spotlighted me or not. But I had to, I mean, he did, and so I tapped my brakes just to see what he wanted there then. I just continued on. I didn't -- I wasn't doing anything wrong, so I didn't have no reason to just, you know, until he stopped me or whatever." (Tr. at 92). Defendant did not brake until the officer turned on his spotlight (Tr. at 97).

Eventually the officer got behind defendant and turned his lights and siren on; but at first he was only spotlighting defendant (Tr. at 89, 92). Defendant waited until he got past a little bridge to pull over because he noticed that his car would have been halfway on the shoulder (Tr. at 92-93).

The police are always sitting in that area and so he knows not to speed in that area (Tr. at 90). In addition, because his license was revoked, he was not going to speed because everyone knows the police are always in that area at night (Tr. at 90).

22. I do not find defendant's testimony credible, to the extent it differs from that of Officer Moore.

a. After watching the dashcam DVD, defendant agreed that his brake lights came on before the "white light" came on, and that he had his foot on the brake for over two seconds (Tr. at 97-101). He still insisted that the spot light was on before he braked and before the "white light" came on (Tr. at 98-99). However, the dashcam DVD clearly shows defendant braking for a long period of time before the spotlight was turned on. This contradicts his testimony.

14

b.    Defendant said that although the dashcam DVD
showed him braking for more than two seconds before the spot
light came on, he was not applying pressure to his brakes (Tr. at
101).  He just hit his brakes "enough to slow down and see what
was going on, because he was going 41 miles an hour.  I don't, I
mean, so, of course, I was going faster than he was." (Tr. at
101).  The dashcam DVD clearly shows defendant going
substantially faster than Officer Moore.  It also shows that when
defendant's brake lights were on, he was slowing down
significantly.  This contradicts his testimony.

c.    After insisting during his hearing testimony that
he had not been speeding, defendant agreed that the dashcam DVD
includes the following:

> Officer Moore:  You know you're going ... you know
> you're going pretty fast didn't you?

> Defendant:  Well man shit I'm trying to get back home.
> Hell I ... and oh Lord shit.

> Officer Moore:  That's the reason I pulled you over man
> I ... you was going way fast.

> Defendant:  Well I know ...

Defendant said he "didn't mean to use that language" (Tr. at
103).  The dashcam DVD shows that when defendant was told he was
pulled over for going "way fast," he said, "Well, I know."  This
contradicts his testimony.

d.    Defendant knew he was driving illegally that night
because his license had been revoked (Tr. at 103).  Defendant is

aware that because of his previous felony convictions he is facing a prison sentence of 15 years to life on this federal charge (Tr. at 106).

       e.   In the dashcam DVD, defendant can be seen leaning over to the right while he was being pursued by Officer Moore. The spotlight reflected on his ball cap making it appear white, and he can be seen leaning over making his head a significant distance from the headrest.  Once defendant pulled over, the spot light showed him sitting with his head even with the headrest. This completely corroborates Officer Moore's testimony of what defendant was doing from the time he passed the patrol car until the time he finally stopped on the shoulder of the highway.

### III. *STOP OF THE VEHICLE*

Defendant argues that he was unlawfully stopped:

> Here, the officer stopped the vehicle because he claimed it
> was speeding.  However, Mr. Harris will testify that he was
> not speeding.  The officer did not use radar to determine if
> Mr. Harris was speeding.  The dash cam does not reveal any
> speed consistent with speeding.  In fact, despite the fact
> the officer claims Mr. Harris [was] speeding, he is able to
> immediately stop the vehicle after the officer activates his
> emergency lights.  This claim is nothing more than a ruse to
> justify a car stop that was based on a "hunch" instead of
> reasonable suspicion.

An officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot.  <u>United States v.</u>

16

Barragan, 379 F.3d 524,528 (8th Cir. 2004); United States v. Bynion, 570 F.3d 1034, 1038 (8th Cir. 2009).

Defendant's version of the facts has proven to be not credible. The dash cam DVD clearly shows (1) that Officer Moore was traveling over 40 miles per hour when he was on the entrance ramp, (2) the speed of the patrol car is not constantly displayed, (3) the patrol car continued to speed up as it merged onto the highway, (4) defendant's car was traveling significantly faster than the patrol car as defendant passed the patrol car, (5) defendant braked for several seconds and his car slowed down substantially as a result, (6) despite the two seconds of braking, defendant's car never did get behind the patrol car or even with it -- after passing Officer Moore, defendant's car at all times remained in front of the patrol car, (7) defendant at no time got into the right lane despite the fact that there were no cars in that lane and the law requires one being stopped by police to pull off the road to the right, (8) instead of appearing to be looking for a place to pull over while being pursued by a police car, defendant was leaning over to the right for several seconds, (9) defendant did not pull over until he sat back upright in the car, and (10) when the officer told him he was stopped for speeding, defendant said, "Well, I know." Based on that evidence, I find that the officer lawfully stopped defendant for speeding and was justified in calling for back up

and asking defendant to put his hands outside the window before the officer approached.

The evidence presented at the hearing clearly contradicts defendant's version of the events (including the allegation that he was not speeding before he was stopped by Officer Moore) in his motion and in his testimony. The evidence supports Officer Moore's testimony that based on his pacing defendant's vehicle, he could tell defendant was speeding. Officer testimony regarding pacing of vehicles is reliable evidence of speeding in absence of radar use, especially in a case like this one where the dash cam evidence corroborates the officer's testimony. See United States v. Stapleton, 10 F.3d 582, 583-584 (8th Cir. 1993).

Because defendant was speeding in the presence of Officer Moore, his stop was lawful and his motion to suppress on that basis should be denied.

## IV. SEARCH OF THE VEHICLE

A reasonable investigation during a traffic stop "may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." United States v. White, 81 F.3d 775, 778 (8th Cir. 1996); United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994), cert. denied, 514 U.S. 1134 (1995). A law enforcement officer may also run a computer check to establish whether the vehicle has been stolen and to ascertain

18

whether there are outstanding arrest warrants for the occupants of the car. United States v. White, 81 F.3d at 778; United States v. McManus, 70 F.3d 990, 993 (8th Cir. 1995).

In this case defendant was unable to provide a driver's license, and Officer Moore learned through a computer check that defendant's license had been revoked. Because defendant was driving with a revoked license, Officer Moore had probable cause to arrest him. See Virginia v. Moore, 553 U.S. 164 (2008); United States v. Riedesel, 987 F.2d 1383, 1388 (8th Cir. 1993); United States v. Sanchez, 2010 WL 4918730, *2 (D. Neb., November 24, 2010).

The Supreme Court has recognized an exception to the warrant requirement for searching a vehicle lawfully impounded by law enforcement officers. Cady v. Dombrowski, 413 U.S. 433, 446-48 (1973). "Impoundment of a vehicle for the safety of the property and the public is a valid 'community caretaking' function of the police," which does not require a warrant. United States v. Petty, 367 F.3d 1009, 1011-12 (8th Cir. 2004) (quoting Cady v. Dombrowski, 413 U.S. at 441).

The impounding of a vehicle passes constitutional muster so long as the decision to impound is guided by a standard policy -- even a policy that provides officers with discretion as to the proper course of action to take -- and the decision is made "on the basis of something other than suspicion of evidence of

19

criminal activity." <u>Colorado v. Bertine</u>, 479 U.S. 367, 375 (1987). These parameters are designed "to ensure that impoundments and inventory searches are not merely a ruse for general rummaging in order to discover incriminating evidence." <u>United States v. Petty</u>, 367 F.3d at 1012 (internal quotation omitted).

Law enforcement may search a lawfully impounded vehicle to inventory its contents without obtaining a warrant. <u>See</u> <u>South Dakota v. Opperman</u>, 428 U.S. 364, 376 (1976); <u>United States v. Pappas</u>, 452 F.3d 767, 771 (8th Cir. 2006) ("An inventory search by police prior to the impoundment of a vehicle is generally a constitutionally reasonable search."). The reasonableness of an inventory search is determined based upon the totality of the circumstances. <u>United States v. Beal</u>, 430 F.3d 950, 954 (8th Cir. 2005). Those circumstances include whether the search was conducted according to standardized procedures. <u>South Dakota v. Opperman</u>, 428 U.S. at 376.

When the driver of a car is arrested, the police may impound the vehicle and conduct an inventory search. <u>United States v. Stephens</u>, 350 F.3d 778 (8th Cir. 2003); <u>United States v. Navarrete-Barron</u>, 192 F.3d 786, 791-92 (8th Cir. 1999).

The evidence establishes that defendant was lawfully arrested and his car was towed pursuant to police policy which provides for towing when a car is improperly parked and when the

20

occupants are taken into custody, as was the case here (P. Ex. 9). Therefore, defendant's motion to suppress on this basis should be denied.

## V. STATEMENTS

Finally, defendant argues that any statement that the gun belonged to his wife is inadmissible because he was not advised of his Miranda rights. Officer Moore testified that after finding the gun in defendant's car, he was upset because he had asked defendant if there was anything in the car he needed to know about. Officer Moore believed this was a safety issue. He testified that it was a "little unnerving" when he found "the barrel of a gun sticking in my face when I go underneath a seat." Officer Moore said to defendant, "You know I asked you if there was anything in the goddamn car. There's a freaking gun." He testified that defendant said, "Well it's probably my wife's."

Under the public safety exception to the Miranda requirement, a suspect's answer may be admitted into evidence if it was obtained in response to a pre-Miranda question asked in furtherance of public safety and not designed solely to solicit testimonial evidence. New York v. Quarles, 467 U.S. 649, 655-656 (1984); United States v. Everman, 528 F.3d 570, 572 (8th Cir.), cert. denied, 129 S. Ct. 627 (208). "The exception does not depend upon the questioning officers' subjective motion," rather, it is analyzed under an objective standard and "applies when

21

'police officers ask questions reasonably prompted by a concern for the public safety.'" United States v. Everman, 528 F. 3d at 572, citing United States v. Liddell, 517 F.3d 1007, 1009 (8th Cir.), quoting New York v. Quarles, 467 U.S. at 656. The public to be protected can include the officers themselves. New York v. Quarles, 467 U.S. at 658 n. 7, 659; United States v. Everman, 528 F.3d at 572.

In United States v. Liddell, 517 F.3d 1007 (8th Cir. 2008), officers stopped a car driven by Liddell who was arrested when a check revealed that he was barred from driving in Iowa. Liddell was arrested and placed in a patrol car while his car was searched. When an officer discovered an unloaded .38 caliber revolver under the front seat, he showed the gun to another officer and asked whether Liddell's person had been thoroughly searched after the arrest. Liddell was removed from the patrol car and asked, referring to Liddell's car, "Is there anything else in there we need to know about? That's gonna hurt us?" The other officer repeated, "That's gonna hurt us? Since we found the pistol already." Liddell laughed and said, "I knew it was there but . . . it's not mine," before telling the officers there were no other weapons in his car.

Liddell argued that the public safety exception did not apply because, at the time the officers asked the question that prompted his incriminating admission, there was no longer an

objectively reasonable need to protect the police or the public from any immediate danger because the revolver had been found, Liddell was handcuffed and under the control of the two officers, and there were no passengers or nearby members of the public who could have accessed or been harmed by the contents of Liddell's car.

The Eighth Circuit disagreed and held that the public safety exception to <u>Miranda</u> applied:

> Our prior cases recognized that the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search. Here, when the officers found Liddell's concealed .38 caliber revolver, they had good reason to be concerned that additional weapons might pose a threat to their safety when they searched Liddell's car incident to a late-night arrest.

<u>United States v. Liddell</u>, 517 F.3d at 1009-1010.

Here Officer Moore was upset about finding a gun pointed at him when he checked under the driver's seat of the car. His statement to defendant ("You know I asked you if there was anything in the goddamn car. There's a freaking gun.") is the equivalent of the statement at issue in the <u>Liddell</u> case and was properly made without <u>Miranda</u> warnings pursuant to the public safety exception. Therefore, defendant's motion to suppress on this basis should be denied.

Case 4:11-cr-00118-DGK   Document 78   Filed 06/18/12   Page 23 of 24

## VI. CONCLUSION

Based on all of the above, I find that (1) Officer Moore lawfully stopped defendant for speeding, (2) defendant was lawfully arrested because he had been driving with a revoked license, (3) the search of defendant's car was a lawful inventory search, and (4) Officer Moore's statement which elicited an incriminating response from defendant was made pursuant to the public safety exception to the <u>Miranda</u> requirement. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 18, 2012

24